**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-4

JOHN EDWARD BURR,

        Petitioner - Appellee,

    v.

KENNETH E. LASSITER, Warden, Central Prison, Raleigh, North
Carolina,

        Respondent - Appellant.

Appeal from the United States District Court for the Middle
District of North Carolina, at Greensboro.  William L. Osteen,
Jr., District Judge.  (1:01-cv-00393-WO-JEP)

Argued:  December 4, 2012        Decided:  March 11, 2013

Before TRAXLER, Chief Judge, and WILKINSON and DUNCAN, Circuit
Judges.

Reversed by unpublished per curiam opinion.

**ARGUED:** Leonard Michael Dodd, NORTH CAROLINA DEPARTMENT OF
JUSTICE, Raleigh, North Carolina, for Appellant.  James P.
Cooney, III, WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Charlotte,
North Carolina, for Appellee.  **ON BRIEF:** Roy Cooper, Attorney
General of North Carolina, Raleigh, North Carolina, for
Appellant.  Ernest Lee Conner, Jr., Greenville, North Carolina,
for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

John Edward Burr ("Burr") was convicted by a North Carolina jury of the first-degree murder and felony child abuse of four-month-old Tarissa Sue ("Susie") O'Daniel, and of assault on a female, and sentenced to death plus thirty days imprisonment. The North Carolina Supreme Court affirmed. See State v. Burr, 461 S.E.2d 602 (N.C. 1995). After unsuccessfully seeking state post-conviction relief, Burr petitioned for habeas relief under 28 U.S.C. § 2254, alleging that his trial attorneys rendered ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), because they failed to develop and present evidence that Susie died from accidental injuries she sustained when her 8-year-old brother tripped and fell while carrying her. The district court granted relief. Because the district court's decision granting Burr relief is contrary to the deference that federal courts must afford state court decisions adjudicating the merits of such constitutional claims, we reverse.

I.

A.

On August 25, 1991, at 2:55 a.m., Susie was admitted to the Alamance County Hospital in North Carolina with a closed head injury, fractures of both thighs and both upper arms, and widespread bruises to her head, face, neck, arms, legs, and

2

torso.  Shortly thereafter she was transferred by ambulance to North Carolina Memorial Hospital in Chapel Hill.  Her head injury proved fatal, and she was pronounced dead on August 27, 1991, at approximately 6:30 p.m.

The state's evidence regarding the events leading up to Susie's hospitalization, including the testimony of Susie's mother, Lisa Bridges, was summarized by the North Carolina Supreme Court as follows:

> [Susie] was born on 1 April 1991 to Lisa Porter Bridges and Bridges' husband at that time, John Wesley O'Daniel.  When Susie was a few weeks old, Bridges began having sexual relations with defendant, who was separated from his wife at the time.  When Susie was six weeks old, John O'Daniel discovered his wife was having an affair with defendant and told Bridges that he wanted a divorce.
>
> Subsequently, in June 1991, Bridges and her four children moved into a trailer located next to a trailer owned by Bridges' brother, Donald Wade.  Near the end of June, defendant moved into the trailer with Bridges and her four children.  Bridges testified that when defendant first moved in with her, "[h]e seemed like a pretty good person," but that after a few weeks, he became physically abusive toward her, bending her hands back in a painful manner, threatening her with a gun, bruising her body, and choking her.  Bridges testified that she remained with defendant after this abuse because she "was scared of him."
>
> On 24 August 1991, defendant and Bridges argued most of the day over defendant spending the previous night at his wife's house and his refusing to take Bridges to her parents' house.  At approximately 6:00 p.m., Bridges' son Scott tripped over a cord while he was carrying Susie.  Bridges testified, however, that she examined Susie after the fall and did not find any marks on her body except for some redness on her arm,

which disappeared. Bridges further testified that later that evening, while she was sitting on the trailer steps with Susie and defendant was mowing the yard, defendant hit Bridges in her lower back with his fist.

After defendant hit her, Bridges went over to her brother's trailer, where defendant eventually joined her. Defendant and Bridges began arguing again, and Bridges left the trailer with the infant child. Bridges testified that defendant followed her and shoved her in the back while she was holding the child. Bridges also told defendant that he was going to make her hurt the child, but Bridges testified that "he just kept running his mouth" and followed her inside her trailer, still arguing.

Once inside the trailer, Bridges placed Susie in her infant swing located in the living room. Bridges testified that while she was still holding onto the swing, defendant pushed her down onto the couch, almost causing her to knock over the swing. When Bridges attempted to get up from the couch, defendant pushed her down again and told her not to leave the couch. Bridges sat on the couch a few minutes and then stood up and walked down the hallway into her bedroom. Bridges testified that defendant followed her to the bedroom and pushed her onto the waterbed, causing the waterbed to break. Bridges testified that after the waterbed broke, defendant "started talking like everything was fine." Bridges and defendant then began repairing the waterbed.

Bridges testified that as they were repairing the waterbed, Susie began to cry and that defendant told Bridges, "go on up there and get her, that's all in the hell she wants anyway, she is so damned spoiled." Bridges took the child out of her swing and brought her back to the bedroom, where she laid her on the waterbed. After defendant finished fixing the bed, Bridges helped her two sons, Scott and Tony, prepare for bed, while her youngest son, John, Jr., remained at Donald Wade's trailer. Bridges testified that she also "got [Susie] to sleep" and placed her in her "baby bed" located in Bridges' bedroom. Bridges testified that when she placed Susie in her bed, she appeared to be physically fine and that she did not have any marks on her. Bridges then went back to the

4

Wades' trailer to wash the dishes. Bridges testified that when she left her trailer, Scott and Tony were ready for bed, Susie was asleep in her bed, and defendant was working on a plug in the living room.

Bridges' son Scott testified that after his mother left to go to the Wades' trailer, and after he went to bed, he was awakened by "hammer noises." When Scott awoke, he heard Susie crying. Scott testified that he then heard defendant "mumbling" and that, after he heard defendant mumbling, Susie stopped crying.

After approximately forty-five minutes, Bridges returned to her trailer and found Susie in her swing in the living room. Bridges testified that defendant was pacing the floor at this time and that he told her to look at the bruises on Susie. Defendant told Bridges that he had moved the child to the swing after she woke up and that some of the marks were grease. Bridges attempted to wash these marks off but discovered that they were not grease.

Bridges testified that she observed bruises in the child's ears, under her neck, on her arms, and on her legs. Bridges further testified that her eyes did not "look right," that she did not act right, and that she did not smile or respond to anything.

Burr, 461 S.E.2d at 607-08.

Burr testified in his defense. He confirmed Bridges' testimony that Scott had tripped and fallen on a gravel roadway while carrying Susie earlier that day. He testified that he also examined Susie after the fall and that she was fine. All of the witnesses confirmed that Susie had no cuts, scrapes, bruises or gravel prints on her skin after the fall. Burr, however, presented a somewhat different version of the events leading up to Susie's hospitalization, as follows:

5

Defendant testified that on the evening of 24 August 1991, he mowed the yard at Bridges' trailer until dark. During this time, Bridges was sitting on the back steps with Susie. Defendant denied having a conversation with Bridges or striking Bridges while he was mowing. Defendant testified that when he finished mowing the yard, he joined Bridges and her children and Donald Wades' daughters, Misty and Christy, at the Wades' trailer and watched television for approximately thirty to thirty-five minutes. Defendant and Bridges were arguing at this time about Bridges going to her parents' house. Defendant testified that Bridges finally "got mad enough [and] went out the door" to her trailer, taking Susie with her. Defendant testified that he remained in the Wades' trailer with Bridges' sons and Wades' daughters.

Defendant testified that after a few minutes passed, he told Scott to tell Bridges that if she wanted to spend the night with her parents, he would take her to their house. Scott left, and, approximately ten minutes later, Bridges returned to the Wades' trailer without Susie. Defendant testified that he told Bridges that he would take her to her parents' house to spend the night. Approximately five minutes later, defendant and Bridges left the Wades' trailer and returned to Bridges' trailer. Defendant testified that he pushed her in a playful manner on the way to her trailer.

Defendant further testified that once they were in Bridges' trailer, he and Bridges went back to the bedroom where the waterbed was located. Defendant testified that at this time, Susie was in her crib in this bedroom. Defendant pushed Bridges onto the waterbed "to have sex," and when he fell on top of her, the bed broke. Defendant and Bridges then attempted to repair the bed. Defendant testified that after they drained the water from the bed and removed the mattress, Bridges went to the Wades' trailer to wash dishes, and he began drilling on the bed. After he started drilling, defendant looked into Susie's crib to see if he had woken her up, and he noticed that her eyes were open. Defendant testified that he stopped drilling, picked up the child, took her into the living room, and put her in the swing, propping up

6

her bottle with a blanket. Defendant wound the swing and pushed it.

Defendant testified that when Bridges returned to her trailer, she helped him put the remaining parts of the bed together. During this time, defendant walked to the kitchen, and he noticed that the swing had stopped and that Susie was holding the blanket with her head over to the side. Defendant returned to the bedroom. Defendant testified that after he and Bridges finished repairing the bed, he took the child out of the swing and brought her back to her crib. As defendant was putting the child down in the crib, he noticed her diaper was wet, and he told Bridges to change the diaper. Defendant testified that when he picked up the child's legs, her eyes started rolling from one side to the other and that Bridges told defendant that the child was having a seizure. Bridges told defendant that one of her sons was born with seizures and that she knew what to do. Defendant testified that at this time, Bridges shook the child and her eyes stopped rolling. When asked how Bridges shook the child, defendant responded, "[I]t wasn't real hard or nothing." Defendant testified on cross-examination that at this time, he and Bridges took the child into the living room and kitchen where they had a lamp and that he noticed bruises on the child.

Defendant testified that . . . he told [Bridges] that some of the marks on the child could be grease. They wiped the child with a cloth, and some of the marks came off. . . . Defendant denied that the child cried while he was alone with her that night, and he denied that he tried to settle her down or that he beat her.

Id. at 609-10.

Burr drove Bridges and Susie to the Alamance County Hospital. While there is some dispute between them as to the events that had occurred up until this point, there is no dispute about Susie's medical condition upon her arrival at the hospital. It was grave. Bridges told Dr. Willcockson, the

7

examining physician, that her 8-year-old son Scott had accidentally fallen while holding Susie the previous day. But it was apparent to Dr. Willcockson that Susie was a victim of child abuse.

> Dr. Willcockson examined the child and observed that she was unconscious and "poorly responsive." The child's eyes were wandering but did not "have any particular following," and her right eye deviated to the right. Dr. Willcockson observed that the child made no oral sounds and that her movements appeared lethargic. The child had occasional twitching of the eyes, face, and arms, which appeared to be seizures according to Dr. Willcockson. The child's respiratory rate was fast, and she had multiple bruises and swellings all over her head, scalp, ears, face, neck, arms, legs, and main portion of her trunk. Further, the soft spot on the child's head where the bones were forming was bulging, a symptom which Dr. Willcockson testified indicates swelling in the head. Dr. Willcockson also testified that Susie had a "grating feeling" in both arms and legs which meant the bones were grating upon each other and which indicates bone fractures. The X rays revealed that both of the child's arms were broken, as well as both of her thigh bones. The X rays further showed that the child had suffered some posterior rib fractures.

> Dr. Willcockson testified that based on the multiplicity of trauma, Bridges' story of another child falling with Susie did not account for the injuries, and he immediately asked Bridges if Susie had been abused, to which Bridges responded in the negative. Dr. Willcockson testified that he "felt that there was such a high suspicion of abuse in the matter" that he contacted the sheriff's department and social services. Dr. Willcockson further testified that based on the bruising around the head, the seizures, and the bulging of the soft spot, he formed the opinion that the child had suffered some form of "closed head injury."

Id. at 608.

8

Due to the severity of her injuries, Susie was transferred to North Carolina Memorial Hospital at 5:15 a.m., where she was examined by Dr. Azizkhan, chief of pediatric surgery and associate professor of surgery at the University of North Carolina Medical School. Dr. Azizkhan also rejected the fall with Scott as a possible cause of Susie's injuries.

> Dr. Azizkhan testified that Susie had bruising of the neck, particularly on the left side of the neck and a two-centimeter-by-two-centimeter area underneath the mastoid and the mandibular portion of her neck. Dr. Azizkhan observed bruising on the right side of the face that extended onto the ear, circumferential bruising of the right arm, and bruising on the back. Dr. Azizkhan testified that the child's blood pressure "was very low for a baby [her] age" and that she had lost "half of her blood volume" from internal bleeding.

> Dr. Azizkhan further testified that the bones of a child Susie's age "are quite malleable and soft" and that "when you see fractures that are of this magnitude in a baby, you know that the amount of force that's been delivered is very significant, much, much greater than from a simple fall." Dr. Azizkhan testified that to inflict the injuries to the child's legs "would require either a severe direct blow or some kind of a snapping activity" and that the fractures to the child's arms "could be from intense grabbing of the arm and torquing and pulling the child's arms backwards." In Dr. Azizkhan's opinion, Susie's injuries were "inflicted" instead of "accidental."

Id. at 608-09. Dr. David Merten, professor of radiology in pediatrics at the University of North Carolina School of Medicine and chief of the section of pediatric radiology at

9

Memorial Hospital, studied Susie's X-rays and also testified at trial.

> Dr. Merten testified that these X rays revealed fractures in both thigh bones with evidence of early healing. In Dr. Merten's opinion, these leg fractures were eight to nine days old. The X rays also revealed fractures on or near both shoulders. These fractures did not show any signs of healing, and, in Dr. Merten's opinion, they occurred five days later than the leg fractures. Dr. Merten testified that the fractures in the legs "were produced simply by bending the knee with violence, significance [sic] force, forward, and hyperextending [the knees]" and that the shoulder fractures were "inflicted and incurred" by "taking the arms and bending them back." Regarding the injuries to the head, Dr. Merten testified that the child had a depressed skull fracture where the skull was actually broken and that the child had suffered injury to the brain underneath this fracture. Dr. Merten testified that this head injury was "a very unusual fracture in a very unusual place" and that "it would take a relatively confined direct blow to that area to produce this type of fracture." Dr. Merten further testified that this head injury occurred within hours before her admission to the hospital in Chapel Hill.

Id. at 609. Dr. Michael Byron Tennison, a child neurologist at Memorial Hospital, testified at trial regarding Susie's CT scan.

> Dr. Tennison testified that this scan showed not only a depressed skull fracture, but also "multifocal intercranial injuries" and bleeding behind both eyes. Dr. Tennison testified that bleeding behind both eyes is "highly suggestive of a shaken baby syndrome," which he defined as a "specific kind of injury where the baby has a whiplash kind of injury from being shaken back and forth." Dr. Tennison further testified that, based on the nature of the skull fracture, the child suffered "quite a force ... by some blunt object" to the side of the head and that it would have taken a great deal of force to cause this fracture.

10

Id.

Despite their efforts, the trauma team at Memorial Hospital was unable to reduce the swelling and pressure in Susie's brain. Dr. Tennison testified that Susie died as a result of "multiple trauma to her head that resulted in contusions of the brain and eventually brain swelling and herniation and brain death." Id. (internal quotation marks omitted).

Dr. Karen Chancellor, a pathologist at Memorial Hospital, performed Susie's autopsy.

> Dr. Chancellor observed multiple bruises on the child's neck that were consistent with marks caused by a hand and bruises on the cheek that were consistent with marks caused by fingers. Dr. Chancellor further observed round bruises on the upper chest area and a round bruise on the back, which bruises, in her opinion, were caused by a blunt object. Dr. Chancellor also observed bruises on the back of the head.

Id. The Report of Autopsy included pathological diagnoses of blunt force trauma to the head, blunt force trauma to the neck and chest with bruising of the neck and chest, and blunt force trauma to all four extremities.

B.

In September 1991, Burr was indicted for Susie's murder and he was appointed trial counsel. In mid-December 1992, with trial rapidly approaching, Burr asked the court to appoint new counsel. The court obliged. The trial was initially set for January 25, 1993, but trial counsel requested and received a

11

continuance to March 1, 1993. Counsel sought an additional one-month continuance on the eve of trial, from both the trial court and the North Carolina Supreme Court, based in part upon their desire to spend additional time evaluating the medical evidence and the need for expert assistance. The requests were denied.

Prior to the start of the guilt phase, however, trial counsel scheduled an in-person consultation with Dr. Desmond Runyan, a physician at Memorial Hospital and Director of the Child Medical Evaluation Program at the University of North Carolina Children's Hospital in Chapel Hill. Dr. Runyan had been called in to consult on Susie's case at the time of her injuries and death but did not testify at trial. The record reflects that Dr. Runyan provided the following information to the North Carolina Department of Social Services ("DSS"):

> [B]oth [of Susie's] arms were broken cleanly through the bone just below the shoulder. Both legs were broken cleanly through just below the hip. There was no evidence of twisting – no spiral fracture of any bone. To break the bones in the manner they were broken would take a hard blow. There is a fracture of the skull that probably occurred on Saturday night. It is just above the right ear on the right temple.
>
> The fractures in the arms [and] legs probably occurred seven to ten days prior to her hospitalization on Sunday morning. All of the breaks have begun calcification. [T]his begins to occur about seven days after the break. [T]he calcification is in different stages, so they would begin to heal, and from her own movement or from being picked up, the breaks would be reinjured. [Susie] would have been in extreme pain. She would have been crying, not eating,

12

and not wanting to be held. The family's account of her behavior does not fit.

J.A. 1436. Dr. Runyan also commented on the issue of whether Susie's injuries could have occurred when Scott fell with her:

> [Dr. Runyan] stated that [Susie] would have to be dropped from about 8 feet 6 inches or more to cause the amount of brain damage and injury th[e] child suffered. An 8 [year] old is not strong enough to cause any of these injuries. The fall with Scott probably would have hurt the child if she hit the ground, but it would be minor injuries. For the breaks in the arms and legs, it would take adult strength blows, not a child. [T]here are two occaisions [sic] of injury; 7-10 days prior to hospitalization and Saturday night.

J.A. 1436.

Given the extent and nature of Susie's injuries, counsel was clearly presented with a difficult case. However, there were no eyewitnesses who could explain Susie's prior abuse or her acute injuries. At trial, trial counsel conceded that Susie was a battered child, with preexisting fractures, and conceded that her fatal injuries were the result of an acute episode of child abuse occurring on August 24. Trial counsel also conceded that Scott's fall with Susie could not have caused the extensive injuries documented by the treating physicians and medical examiner. Trial counsel argued, however, that the state could not prove beyond a reasonable doubt that Burr -- who was only sporadically in the home and not a primary caretaker -- was Susie's abuser either prior to or on the night in question.

13

In support of this strategy, trial counsel elicited testimony from Dr. Chancellor that one quick, hard blow to Susie's head by a fist could have caused the fatal injury, and presented evidence and argument that there were others with motive and opportunity to inflict the fatal wound. In particular, counsel pointed the finger at Bridges, who had been angry and arguing with Burr all day and who had opportunities to abuse Susie. Counsel pointed out that it was not credible to believe that Bridges, who was Susie's primary caretaker, had failed to realize that Susie had preexisting fractures or see the older, brown bruises that were present from the earlier injuries. Counsel also pointed out Bridges' admission that, before she and Burr took Susie to the emergency room, Bridges took the time to instruct her three minor children about what they should say if the authorities came to question them. According to Bridges' testimony, she "told the boys that as bad as their sister looked that if anybody came by and asked them did I abuse them or beat on them, you tell them that I whip you in the right way." J.A. 2054. When asked why she had taken this step to warn her children, Bridges responded that it was "[b]ecause Susie looked that bad." J.A. 2054. Counsel also pointed out that, while Bridges initially denied to the authorities that Burr was abusive to her, and Bridges and Burr both related only the fall with Scott as a possible cause of

14

Susie's injuries, Bridges changed her story and began to direct suspicion towards Burr once the treating physicians and authorities unanimously rejected the possibility that Susie's injuries could have occurred from the fall.

Trial counsel also presented the testimony of Colene Faith Flores. Flores claimed that she saw Bridges at a friend's house with a baby in August 1991. Flores testified that after the baby had been crying constantly for approximately thirty-five minutes, "she . . . observed Bridges walk over to the baby," who had been propped on the couch, "and 'smack' her, stating, 'you're driving me crazy.'" Burr, 461 S.E.2d at 611. Flores testified that "the baby fell off the couch." Id.[1] Trial counsel also impeached Bridges "regarding the lack of cleanliness of Bridges' home and her children, the truancy problem with her children, the fact that DSS has received [prior] allegations of neglect against Bridges concerning two of her sons, and a social worker's opinion that Bridges' psychiatric history and relationship with men suggest[ed] instability." Id. at 618 (alteration and internal quotation

---

[1] The state called Flores' ex-boyfriend, James Whitlow, to testify on rebuttal. "Whitlow testified that he was with Flores at her friend's house and that at no time did he observe anyone slap the baby off the couch. Whitlow also testified that he had discovered Flores lying to him previously." Burr, 461 S.E.2d at 611.

marks omitted). There was evidence that Bridges had been hospitalized and received medication and treatment for depression not long before she became pregnant with Susie.

Despite trial counsel's efforts, the jury convicted Burr of first degree murder, felony child abuse, and assault on a female. Upon the jury's recommendation, the court sentenced Burr to death for the murder, to thirty days imprisonment for the assault on a female conviction, and arrested judgment on the felony child abuse conviction.

With the assistance of new counsel, Burr filed a direct appeal to the North Carolina Supreme Court. Among other arguments, Burr contended "that the trial court erred by failing to grant his motion for a continuance, thereby violating his constitutional rights to confrontation and to the effective assistance of counsel." Id. at 619. In rejecting this claim, the court found as follows:

> [D]efense counsel had access to the medical evidence containing the necessary evidence they required regarding the need for an expert for two months prior to trial, and having observed the evidence and medical testimony at trial, defendant has had ample opportunity to show how his case would have been better prepared with regard to this evidence had the continuance been granted, or to show that he was materially prejudiced. He has failed to do so.

Id. at 620. The Supreme Court denied certiorari. See Burr v. North Carolina, 517 U.S. 1123 (1996).

16

C.

On September 27, 1996, Burr's state post-conviction counsel filed a Motion for Appropriate Relief ("MAR") in state court, which was followed by several amendments. Burr claimed, inter alia, that his trial counsel were constitutionally deficient under Strickland because they failed to adequately investigate the medical evidence in the case. More particularly, however, Burr asserted that trial counsel should have developed and presented to the jury expert testimony that Susie may have suffered from an undiagnosed condition of Osteogenesis Imperfecta, or "brittle bone disease," (the "OI" evidence), which could explain her prior fractures, and/or that her fatal injuries occurred when her 8-year-old brother Scott tripped and fell while carrying her that day (the "short-fall" evidence). In support of this theory of accidental injury and death, Burr submitted affidavits from three consulting experts who reviewed the Alamance County Hospital and North Carolina Memorial Hospital records.

The first affidavit was from Dr. Jerry C. Bernstein, a Clinical Professor of Pediatrics at the University of North Carolina Medical School. Although Dr. Bernstein agreed that "consideration of abuse [was] uppermost in one's diagnosis," he stated that the number and nature of the multiple fractures "should raise a question of osteogenesis imperfecta (brittle

17

bone disease)," and that Susie's injuries could have resulted from an accidental fall compounded by OI.  J.A. 968.

After consulting with Dr. Berstein, counsel obtained a second affidavit from Dr. Colin R. Paterson, from the University of Dundee, in Scotland, who was considered to be a leading expert in brittle bone diseases.  Dr. Paterson also stated that "[t]he number and distribution of fractures . . . raises the possibility of brittle bone disease (osteogenesis imperfecta)." J.A. 908.  He attributed the earlier fractures to "some form of [OI]," and all of Susie's acute injuries to a "bad fall . . . compounded by this disease."  J.A. 909.

Both Dr. Bernstein and Dr. Paterson based their opinions upon an accident whereby Scott dropped Susie to the ground and then fell on top of her -- a version of the accident that appeared in some early medical and investigative reports but which was not supported by the eyewitness testimony at Burr's trial.  Both Dr. Berstein and Dr. Paterson also noted that, based upon their review of the medical records, Susie's treating physicians may not have considered this OI/short fall combination as a possible explanation for Susie's preexisting and fatal injuries.

The final affidavit was from Dr. John J. Plunkett, a forensic pathologist and coroner from the State of Minnesota. Dr. Plunkett stated that Susie's injuries were "absolutely

18

consistent with those which may be caused if she was dropped onto a gravel surface by an older sibling, who then fell on top of her." J.A. 943. Dr. Plunkett did not address the possibility of a brittle bone disease, nor did he address the cause of Susie's prior, healing fractures.

The state offered evidence in opposition, including an affidavit outlining the district attorney's interviews of Susie's treating physicians and their opinions regarding OI and Scott's fall with Susie. The physicians rejected these theories as alternative causes of Susie's extensive injuries and death, and it appears that the state was prepared at trial to refute any such accidental death claim with, at a minimum, these opinions.

In two exhaustive orders, the state MAR court considered and rejected Burr's ineffective assistance of counsel claim.[2] In doing so, the state court made a number of factual findings and conclusions that we summarize here.[3]

---

[2] On July 29, 1998, the North Carolina Supreme Court granted Burr's Petition for Writ of Certiorari for the limited purpose of reconsideration in light of two state court cases. See State v. Burr, 511 S.E.2d 652 (N.C. 1998). This led to the second state MAR court's issuance of a second "Order and Memorandum Opinion," dated June 15, 2000, again denying relief. J.A. 1786.

[3] Burr additionally argued that he should be granted a new trial under North Carolina law based upon the "newly-discovered" OI/short-fall evidence. While the new-trial claim is not directly relevant here, the state MAR court made findings and (Continued)

With regard to the expert opinions that Susie may have suffered from OI or some similar degenerative or brittle bone disease that her treating physicians did not recognize or consider, the state court pointed out that the "defendant, the party with the burden of proof . . . ha[d] not presented anything from the experts who testified at trial demonstrating either that they never considered the possibility that Susie had OI or that they believed that she had OI and that OI contributed to her death." J.A. 1420 (emphasis added). On the contrary, the court observed that "matters of record indicate that the experts who testified found nothing indicative of bone disease when evaluating Susie." J.A. 1420. In particular, the state MAR court noted Dr. Merten's testimony that Susie's "bones [were] perfectly normal other than the injuries," J.A. 1421 (internal quotation marks omitted); Dr. Merten's confirmation to the lead prosecutor "that he had observed nothing in [Susie] to indicate that she suffered from any such disease," J.A. 1421; Dr. Azizkhan's reference in his trial testimony "to the very rare condition of brittle bones in premature babies, evidence indicating that he too was aware of the existence of 'brittle

conclusions in connection with this claim that are also pertinent to its rejection of the ineffective-assistance-of-counsel claim.

20

bone' disease," J.A. 1421; and the testimony of the medical examiner, Dr. Chancellor, that "there was no degenerative disease processes" observed, J.A. 1421 (internal quotation marks omitted).

The state court also reviewed numerous articles regarding child abuse and OI that had been provided by Dr. Merten and submitted to the court. The court found the articles to be indicative "of the knowledge possessed by a reasonably prudent physician concerning the causes and diagnosis of child abuse vis-à-vis accidental injury," J.A. 1391, and noted that four of the articles "included references to children with bone disease or osteogenesis imperfecta," J.A. 1398. The court additionally reviewed the medical records and noted that "the salient features indicating the possible existence of OI" were not present in Susie. J.A. 1422. Finally, the court noted that the consulting expert's opinion regarding Scott's fall was contrary to the evidence at trial regarding the accident, contrary to the unanimous views of the physicians who treated Susie, and did not address OI. Nor, we note, did it explain Susie's preexisting fractures.

Having reviewed all of the medical evidence presented, and taking note of the qualifications, experience, and training of Susie's treating physicians, the state court found no basis upon which to conclude that the eminently qualified physicians who

21

treated Susie "simply failed to give any consideration as to whether Susie had a bone disease that contributed to her death," J.A. 1422, and found that "the far more reasonable inference is that [they] knew that fractures are sometimes caused by degenerative bone disease, but that nothing indicative of bone disease surfaced while they were evaluating Susie and the circumstances surrounding her injury and death. Defendant, who has the burden of proof, has not demonstrated otherwise." J.A. 1422.

Turning more specifically to the claim that trial counsel did not adequately prepare for trial, the state court made a number of additional findings, as follows:

> First, matters of record demonstrate that trial counsel worked diligently for a reasonable amount of time. . . . Second, lead trial counsel had considerable experience in the Guardian Ad Litem program that helped him understand the dynamics of a prosecution based on child abuse. Third, trial counsel had an opportunity before trial to review both the medical evidence available and the thorough statements of a number of witnesses and other information in the State's open files. Fourth, trial counsel knew before trial that a host of eminent medical experts had reviewed available information concerning Susie and her cause of death, and that all experts opined that Susie died of child abuse, not an accidental fall. Fifth, even though trial counsel tried diligently to delay the start of the trial, defendant's well-qualified and experienced lead trial counsel never asserted a particularized necessity for appointment of an expert. Sixth, defendant's pre-trial motions and the transcript demonstrate that trial counsel's actions were driven by a strategy to attempt to shift blame to a third party (e.g., Susie's mother) and the understanding, based on the review of

22

> a plethora of information from respected physicians, that Susie's death was not attributed to accidental injury.

J.A. 1807-08 (internal citation omitted). In addition, the state MAR court observed that while "[d]efendant's postconviction counsel have found experts who take issue with the [medical] witnesses at trial[,] [t]he mere fact that they have found such experts does not demonstrate ineffectiveness of counsel." J.A. 1809. The state court observed that "trial counsel's actions [must be evaluated] in light of the circumstances facing trial counsel at and before trial, and not from the vantage point of '20-20 hindsight,'" that counsel's "performance was objectively reasonable" under the circumstances, and that "defendant's proffers of evidence have not shown a reasonable probability that but for trial counsel's alleged unprofessional errors, the result of the trial would have been different." J.A. 1809. The North Carolina Supreme Court denied Burr's petition for certiorari. J.A. 1864.

### D.

On April 12, 2001, Burr filed the instant petition for a writ of habeas corpus under 28 U.S.C. § 2254(d). On December 14, 2004, the magistrate judge recommended that habeas relief be granted, but subsequently stayed the matter pending the development of additional evidence, including the identification and discovery of additional experts. Following such discovery

23

and supplemental briefing, the magistrate judge issued a supplemental recommendation that habeas relief be granted.[4]

On May 30, 2012, the district court issued its order granting habeas relief. Because the Supreme Court's then-recent decision in Cullen v. Pinholster, 131 S. Ct. 1388 (2011), made it clear that the development of the evidence in the federal habeas proceedings should not have been allowed, the district court considered only the record that was before the state MAR court when it made its decision. The district court ruled that Burr had made a sufficient showing that his trial counsel were ineffective for failing to conduct additional investigation into the medical evidence, and that the state court's rejection of the claim was unreasonable. This appeal followed.

II.

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996, our review of the state MAR court's decision rejecting Burr's ineffective assistance of counsel claim is highly deferential. Where, as here, a federal habeas petitioner's constitutional claim has been "adjudicated

---

[4] The magistrate judge noted the state's additional motion to quash the affidavit of Dr. Paterson, whose medical license had been revoked, and stated that this "would cause the Court, at the very least, to afford his opinion considerably less weight than previously assigned." J.A. 443.

24

on the merits in State court proceedings," we may not grant relief unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). See also Harrington v. Richter, 131 S. Ct. 770, 785 (2011).

The "clearly established" Supreme Court precedent at issue in this appeal is Strickland v. Washington, which sets forth the two-prong standard for evaluating Sixth Amendment claims of ineffective assistance of counsel. To establish ineffective assistance of counsel, "the defendant must show that counsel's performance was deficient," and that "the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687.

To demonstrate inadequate or deficient performance under Strickland, the defendant must "show that counsel's representation fell below an objective standard of reasonableness" measured by "prevailing professional norms."

25

Id. at 688. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.

To demonstrate prejudice under Strickland, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," i.e., that he would have been found not guilty. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome. It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" Harrington, 131 S. Ct. at 787 (citation omitted) (quoting Strickland, 466 U.S. at 693). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Id. at 787-88 (quoting Strickland, 466 U.S. at 687).

Consequently, where the issue is whether the state court has unreasonably applied Strickland standards to an ineffective assistance of counsel claim, "double deference" is required – deference to the state court judgment granting deference to trial counsel's performance.

26

"Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 130 S. Ct. 1473, 1485 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. Strickland, 466 U.S. at 689-90. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." Id. at 689; see also Bell v. Cone, 535 U.S. 685, 702 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. Strickland, 466 U.S. at 690.

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," id., at 689; Lindh v. Murphy, 521 U.S. 320, 333, n. 7 (1997), and when the two apply in tandem, review is "doubly" so, Knowles [v. Mirzayance], 129 S. Ct. [1411], 1420 [2009]. The Strickland standard is a general one, so the range of reasonable applications is substantial. 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington, 131 S. Ct. at 788.

As the Court succinctly stated, "[i]f this standard is difficult to meet, that is because it was meant to be." Id. at

27

786. Indeed, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id.

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87. "Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding.

Id. at 787 (emphasis added).

## III.

We begin with Burr's argument that we should review the state MAR court decision de novo instead of under the deferential standards of § 2254(d). Relying upon our decisions in Winston v. Kelly, 592 F.3d 535 (4th Cir. 2010) ("Winston I"), and Winston v. Pearson, 683 F.3d 489 (4th Cir. 2012) ("Winston II"), Burr argues that the state court decision was not an adjudication on the merits for purposes of § 2254(d) because the state court denied his request for an evidentiary hearing.

In Winston I, we held that a state court decision might not be deemed an adjudication on the merits for purposes of § 2254(d) if diligent counsel was unable to complete the state court record because the "state court unreasonably refuse[d] to

28

permit further development of the facts of a claim." Winston II, 683 F.3d at 496 (internal quotation marks omitted). Here, while the MAR court did not hold an evidentiary hearing, Burr's state post-conviction counsel had an unfettered opportunity to obtain and present expert opinions in support of the new OI/short-fall theory of defense, and the state MAR court accepted the affidavits of these experts at face value. The state court did not deny Burr's state post-conviction counsel an opportunity to develop the evidence that was presented during the federal evidentiary hearing. Indeed there is no reason to believe that state post-conviction counsel could not have developed the exact evidence produced by Burr's counsel in the federal evidentiary hearing. The fact that Burr's state post-conviction counsel requested but was denied an evidentiary hearing simply does not, without more, warrant de novo review of the state court's decision. See Winston II, 683 F.3d at 497. Accordingly, like the district court, we review the state court's adjudication of the Strickland claim under the deferential standards of § 2254(d).

## IV.

### A.

Burr contends that his trial counsel were constitutionally deficient because they failed to conduct an adequate

29

investigation into the medical evidence in this case, and failed to make a reasoned decision that further investigation was not required. See Rompilla v. Beard, 545 U.S. 374, 380 (2005); Wiggins v. Smith, 539 U.S. 510, 521-22 (2003). The heart of Burr's claim, however, is that trial counsel were ineffective because they failed to obtain and present expert testimony to refute the medical opinions of Susie's treating physicians, and failed to present to the jury an argument (1) that Susie had OI which, combined with accidents, explained all of her injuries, or (2) that even if Susie was a battered child, her fatal head injury was from the fall with Scott alone and not from an acute incident of such child abuse.

To obtain federal habeas relief on this Strickland claim, however, Burr must satisfy us that the state court's rejection of Burr's arguments "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786-87. "[T]he question is not whether [trial] counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. at 788. Burr has failed to overcome this hurdle.

The state MAR court found that trial counsel had experience in child abuse matters, had adequate time to review the medical

30

evidence and witness statements, and worked diligently for a reasonable amount of time investigating the case. Mindful that it must "evaluate trial counsel's actions in light of the circumstances facing trial counsel at and before trial, and not from the vantage point of '20-20 hindsight,'" the state court concluded that trial counsel's "performance was objectively reasonable." J.A. 1809. We cannot say that this was an unreasonable determination of the facts in light of the state court record, or an unreasonable application of Strickland's deferential standards.

There is no question but that Burr's trial counsel were aware of Scott's fall with Susie earlier in the day. However, Susie was observed by both her mother and by Burr to be fine after the fall. All of the witnesses who checked on Susie after the fall related that she had no cuts, scrapes, or gravel marks, which was also consistent with the "cradled fall" description that was given by the witnesses during the investigation and at trial. More importantly, however, trial counsel were presented with medical records from independent, eminently qualified treating physicians and pediatric specialists documenting the preexisting and acute non-accidental injuries that Susie had sustained, and unanimously rejecting the notion that Scott's fall with Susie (even as originally reported) was a possible cause of the injuries.

31

Susie's initial treating physician at Alamance County Hospital immediately recognized that Susie had sustained diffuse, severe injuries, and that the fall with Scott, as Bridges had related it to him, could not account for them, prompting him to alert authorities to the suspected child abuse. The investigating authorities observed and documented the severity of the injuries as well. Susie's treating and evaluating physicians at the UNC Medical Center, all of whom were pediatric and child abuse experts, were also of the unanimous opinion that Susie had been abused, and that Scott's fall could not have caused her injuries.

When Susie was admitted to the hospital, she had sustained an acute, blunt force head injury and was suffering from the effects of it, including seizures, swelling of the fontanel, and unconsciousness. Even if competent trial counsel would have reasonably entertained the notion that Susie's lethal head injury might have occurred when Scott fell with her earlier in the day (in the face of the evidence that she had no visible marks and seemed fine thereafter), the head injury was just the start of the picture painted by these records.

As noted above, Susie had no visible marks or bruises when she was checked by her mother, Burr and other family members. But when Susie arrived at the hospital six hours later, she had multiple bruises and swelling all over her head, scalp, ears,

32

face, neck, arms, legs, and trunk. Bruises on her neck were consistent with marks caused by a hand. Bruises on her cheek were consistent with marks caused by fingers. Round bruises to the upper chest and back indicated that a blunt object had been utilized to inflict them. There were additional bruises to the back of the head, as well as bleeding behind both of her eyes which was considered to be suggestive of shaken baby syndrome. In addition, both of Susie's upper thighs and both of Susie's upper arms "were broken cleanly through." J.A. 1436. The nature of the breaks suggested either significant direct blows or gruesome, manual manipulation of the extremities. Susie's leg breaks were consistent with her knees being bent forward with violence and significant force, hyperextending the knees until the leg was broken. Susie's arm breaks were consistent with someone grabbing her arms, torqueing them and pulling them backwards.

To the extent Burr continues to press OI as a possible, contributing cause of Susie's injuries and death, there was likewise nothing in the records that would have raised such a possibility.[5] As the state court found, Burr, "the party with

---

[5] The district court properly declined to consider the additional evidence developed during the federal habeas proceedings, but it did observe that the evidence that Susie suffered from OI had weakened. On appeal, Burr's counsel largely abandons the OI portion of the claim, which was the
(Continued)

33

the burden of proof . . . [did] not present[] anything from the [treating physicians] demonstrating either that they never considered the possibility that Susie had OI or that they believed that she had OI and that OI contributed to her death." J.A. 1420 (emphasis added). On the contrary, the "matters of record indicate[d] that the [treating physicians] found nothing indicative of bone disease when evaluating Susie." J.A. 1420. There was simply no basis upon which to conclude that Susie's treating physicians "failed to give any consideration as to whether Susie had a bone disease that contributed to her death," J.A. 1422, and that "the far more reasonable inference [was] that [they] knew that fractures are sometimes caused by

---

primary focus of the argument presented to the state MAR court. Counsel barely mentions Dr. Bernstein or Dr. Paterson in the history of the case, and confirms the state's introduction of evidence that "Dr. Paterson was [subsequently] charged with providing misleading testimony about another syndrome, Temporary Brittle Bone Disease," Appellee's Brief at 29 n.11, apparently causing him to lose his medical license. Instead, Burr primarily relies instead upon Dr. Plunkett's affidavit and argues that counsel should have developed evidence that Susie's fatal injury could have resulted from the fall with Scott alone.

While we take note of this evolution of the post-conviction claim as it has progressed over the past 16 years, we do not consider the evidence as it developed in the federal court and need not confront the issue of Dr. Paterson's credibility at this juncture. The state court accepted Dr. Paterson's affidavit at face value. Our review is limited to the question of whether the state court's adjudication of the ineffective assistance of counsel claim, as it was presented to it, was unreasonable.

degenerative bone disease, but that nothing indicative of bone disease surfaced while they were evaluating Susie and the circumstances surrounding her injury and death." J.A. 1422.

The record also does not support Burr's contention that trial counsel unreasonably failed to secure the assistance of an expert in light of the factual investigation and medical records. Trial counsel requested an eleventh-hour continuance based in part upon their stated desire to evaluate the need for expert assistance. That request was denied. But, prior to the start of the guilt phase of Burr's trial, counsel did in fact consult with Dr. Runyan, a leading North Carolina child abuse expert. Dr. Runyan confirmed that Susie's death was non-accidental and that Scott's fall could not have been the cause. According to Dr. Runyan, Susie "would have to be dropped from about 8 feet 6 inches or more to cause the amount of brain damage and injury [she] suffered." J.A. 1436.[6]

---

[6] During their treatment of Susie, some of the physicians, based upon x-rays and CT scans, observed that Susie had sustained a skull fracture in addition to the underlying closed head trauma that led to her death. Dr. Chancellor's autopsy report indicated that there was no fracture of the skull, although there was clearly no dispute as to the existence of the blunt force head trauma that caused Susie's death. Burr makes much of the existence or nonexistence of an actual fracture to the skull itself, but we are at a loss to see much critical significance. All of the treating physicians and the medical examiner agreed that the cause of Susie's death was blunt force head trauma, and its resulting swelling and pressure in the brain, and that significant force was necessary to cause this
(Continued)

As the state court reasonably observed, "trial counsel knew before trial that a host of eminent medical experts had reviewed available information concerning Susie and her cause of death, and that all experts opined that Susie died of child abuse, not an accidental fall." J.A. 1807 (emphasis added). These medical opinions were not from consulting experts or state witnesses retained or employed to assist in the collection of evidence on behalf of the prosecutors. They were from the treating physicians who actually examined Susie and attempted to save her life, and from the medical examiner that conducted the autopsy. We have no doubt that competent trial counsel, after consulting with Dr. Runyan, reasonably concluded that further investigation was unnecessary, and that they were foreclosed from credibly arguing to the jury that Susie died as a result of the accidental fall with her 8-year-old brother. The medical opinions regarding the existence of child abuse and the non-accidental nature of the cause of death were unanimous, consistent with the physical evidence and factual investigation, and overwhelming.

---

trauma. Burr presented no evidence to the state MAR court that the treating physicians would have changed their opinions regarding child abuse vis-à-vis accident based upon the difference in the radiographic evidence and the autopsy report.

Finally, Burr's claim that trial counsel's concession of child abuse and failure to pursue alterative theories of injury and death left Burr defenseless and the jury with no "rational option" other than to convict is likewise not supported by the record. See Elmore v. Ozmint, 661 F.3d 783, 855 (4th Cir. 2011). As the state MAR court observed, "trial counsel's actions were driven by a strategy to attempt to shift blame to a third party (e.g., Susie's mother) and the understanding, based on the review of a plethora of information from respected physicians, that Susie's death was not attributed to accidental injury." J.A. 1807-08. Our independent review of the record of the trial unquestionably reveals this to be the case. Capitalizing upon Burr's minimal role in the family, as well as evidence of Bridges' actions leading up to and on the night of the fatal abuse, trial counsel pointed the finger at Bridges as an alternative suspect, and persuasively argued reasonable doubt to the jury.

Burr's current post-conviction counsel ignores this clear strategy, and repeatedly represents that trial counsel did no more than concede abuse and argue that Susie might have been attacked by a "deranged stranger" who entered the trailer and inflicted the mortal punch – all to support the claim that trial counsel's strategy was ridiculous and left the jury with no choice but to convict. See e.g., Appellee's Brief at 19, 29-30;

37

id. at 43 (citing a portion of trial counsel's closing argument and arguing that "by abandoning the fall without adequate investigation, [counsel] were left with no theory at all, other than perhaps a 'deranged stranger' beat Susie."). But this is simply not the case at all.

Trial counsel did reference a "deranged stranger" in closing argument, but the reference was clearly offered to the jury in the context of explaining reasonable doubt. Actually, trial counsel argued to the jury that while such a "deranged stranger" was "a possible explanation," it would likely "fall[] within what the District Attorney's office would call the ingenuity of counsel, a fanciful doubt, not a reasonable doubt." J.A. 4065. Trial counsel then proceeded, in accordance with the planned strategy, to discuss the evidence of the family members that had motive and opportunity to inflict the fatal injuries that night, culminating in the argument that Bridges was the most probable culprit and, at a minimum, enough of a suspect to create such reasonable doubt.

Having considered the record and arguments of counsel, we simply cannot say that the state court's adjudication of the performance prong of Strickland was an unreasonable one. There is certainly a "reasonable argument that [trial] counsel satisfied Strickland's deferential standard" by reviewing the medical evidence, consulting with Dr. Runyan, and pursuing an

38

alternative-perpetrator, reasonable-doubt defense that was consistent with the factual investigation and the overwhelming medical evidence that Susie was a victim of child abuse. Harrington, 131 S. Ct. at 788.

B.

Considering the second prong of Strickland, the state court found that Burr's evidence failed to show a reasonable probability that but for trial counsel's alleged unprofessional errors, the result of the trial would have been different. We cannot say that the state court's adjudication of the prejudice prong was unreasonable either.[7]

The jury rejected a defense strategy aimed at creating reasonable doubt in their minds that Burr, as opposed to Susie's mother or the other persons with access to Susie, inflicted the

---

[7] On appeal, Burr has argued that the state MAR court applied the wrong prejudice standard, again necessitating de novo review of the claim. In support, however, Burr cites to the state MAR court's initial order that includes, in connection with the prejudice prong of Strickland, the observation that Burr had "proffer[ed] nothing demonstrating that his trial was fundamentally unfair or that the results are unreliable as a result of trial counsel's performance," J.A. 1443, and cites Lockhart v. Fretwell, 506 U.S. 364, 369 (1993), as the pertinent authority in support. However, in the state MAR court's second decision, issued on remand from the North Carolina Supreme Court, the state MAR court explicitly recognized the clarification that Williams v. Taylor, 529 U.S. 362, 391 (2000), provided to the Strickland prejudice prong and the breadth of Lockhart, and reconsidered and reissued its decision in light of the Supreme Court's clarification. Burr's representation that the state court applied the wrong standard of review appears to overlook this second order.

mortal wound.  Indeed, Burr's post-conviction counsel argued before us that competent trial counsel would have presented this defense, seemingly ignoring the fact that trial counsel did present this defense.  In any event, the stakes are high, and it is all too tempting for post-conviction counsel, with the benefit of hindsight, to second-guess the investigative decisions of trial counsel and to now argue that Burr might have fared better on the reasonable doubt argument if trial counsel had presented the jury with the theory that Susie could have sustained her lethal head injury when Scott tripped and fell while carrying her.

This argument, however, does not take into account the prosecution's plans to refute any claim that Scott's fall with Susie resulted in her condition, nor prosecutorial arguments that might well have weakened the credible, alternative perpetrator defense that trial counsel did advance on Burr's behalf.  Indeed, it takes little effort for us to imagine a converse case -- where post-conviction counsel would criticize trial counsel's decision to risk credibility by advancing a speculative osteogenesis imperfecta/accidental death theory that would blame Susie's injuries upon her 8-year-old brother in direct contradiction to the opinions of the physicians, pediatric specialists and child abuse experts who treated and evaluated her.  We pass no judgment on the merits of such a

hypothetical Sixth Amendment claim, of course, but it highlights why such double-deference is due to state courts that adjudicate Strickland claims. "Reliance on the harsh light of hindsight to cast doubt on a trial that took place [20] years ago is precisely what Strickland and AEDPA seek to prevent." Harrington, 131 S. Ct. at 789 (internal quotation marks omitted). It not our role to conduct such an "intrusive post-trial inquiry" into the defense of this crime, id. at 788, or to second-guess the "state proceedings [that] are the central process, not just a preliminary step for a later federal habeas proceeding," id. at 787. At a minimum, Burr's ineffective assistance of counsel claim lends itself to "fairminded disagreement" among jurists, id. at 787, and the double deference due to the actions of trial counsel and the decisions of the state courts that evaluate them compel denial of federal habeas relief.

V.

For the reasons set forth above, the judgment of the district court is reversed.

REVERSED